UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————X
ALLAN R. MILLER and
CHERYL A. MILLER,

                  **Plaintiffs,**                  Case No.

   -against-

                                           **COMPLAINT**
AUSTIN LLOYD, INC., CHRISTOPHER M.
PARADISE, BRANDON E. CHANCEY,
SEAN KLEIN, PATRICK J. WHITE, DAVID
SCHMIDT, P. WHITE HOLDINGS, LLC, and
MIKE TODD,

                  **Defendants.**
————————————————————X

       Plaintiffs, Allan R. Miller ("Mr. Miller") and Cheryl A. Miller ("Mrs. Miller") (collectively

"the Millers" or "Plaintiffs"), complaining of Defendants, Austin Lloyd, Inc. ("ALI"), P. White

Holdings, LLC ("PWH"), Christopher M. Paradise ("Paradise"), Brandon E. Chancey

("Chancey"), Patrick J. White ("White"), David Schmidt ("Schmidt"), Mike Todd ("Todd") and

Sean Klein ("Klein"), respectfully allege:

## NATURE OF THE CASE

1.     This action is brought pursuant to the Racketeer Influenced and Corrupt Organizations Act,

18 U.S.C. §§ 1961-1968 (RICO), and New York law by Allan R. Miller and Cheryl A. Miller

against Christopher M. Paradise (RICO Person), Brandon E. Chancey (RICO Person), Patrick J.

White (RICO Person), David Schmidt (RICO Person), Mike Todd (RICO Person), and Sean Klein

(RICO Person) (collectively the "RICO Persons") operating by and through Austin Lloyd, Inc.

(RICO Enterprise) and P. White Holdings, LLC (RICO Enterprise) for their unlawful, false,

misleading and unconscionable misrepresentations and sales tactics that resulted in direct damages

to Plaintiffs of approximately Ninety-Two Thousand Dollars ($92,000.00) through a systematic pattern of fraud and breach of fiduciary duty resulting in the theft and conversion of Plaintiffs' coin inventory. The Millers seek restitution of their actual damages, plus consequential damages, punitive damages, pre- and post-judgment interest, attorneys' fees, litigation expenses and costs of suit.

**2.**    Upon information and belief, the RICO Persons, Paradise, Chancey, White, Klein, Todd and Schmidt, conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises, Austin Lloyd, Inc.  and P. White Holdings, LLC through an open-ended pattern of racketeering activity as set forth herein. At all relevant times, the RICO Persons' wrongful actions were committed willfully, maliciously, with intent to injure and damage Plaintiffs, and with reckless disregard of their legal rights. The Defendants' interactions with the Millers do not represent a one-off, isolated transaction but rather are representative of and are part and parcel of the RICO Persons' normal pattern and scheme through which they have defrauded—and continue to defraud—hundreds (if not thousands) of other unsuspecting consumers out of millions of dollars.[1]

**3.**    Plaintiffs seek recovery of the coins they shipped to ALI for grading, appraisal, valuation and potential sale to ALI and which Defendants either still possess or else compensatory damages for those same coins to the extent that Defendants have sold them, without authorization, for their own ill-gotten profit, along with consequential damages, exemplary damages, treble damages under 18 U.S.C. § 1964, pre- and post-judgment interest, attorneys' fees, litigation expenses, and costs of suit.

---

[1]  *See, e.g., Stephen E. Mauch v. Austin Lloyd, Inc., et al.*, Case No. 2:22-cv-04180 (E.D.N.Y.) filed July 16, 2022. (coin fraud claim for $1.8 million). *See also Jeffrey Miller v. Austin Lloyd, Inc., et al.*, Case No. 2:23-cv-06140-JMA-SIL (E.D.N.Y.) filed August 16, 2023.

## JURISDICTION AND VENUE

**4.**     This Court has original subject-matter jurisdiction over the RICO claims pursuant to 29 U.S.C. §1331, 18 U.S.C. §1964, and 18 U.S.C. §§1961 et seq. In addition, or else in the alternative, this Court has original subject-matter jurisdiction over all claims in this suit based upon complete diversity as Plaintiffs are citizens of a different state (Iowa) than all Defendants (New York) and the amount in controversy exceeds $75,000, excluding interest and costs. 29 U.S.C. §1332(a).

**5.**     Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C § 1391(a) because at all relevant times at least one Defendant resided, was found, had agents and/or conducted business in this District. Moreover, a substantial part—if not all—of Defendants' wrongful acts and omissions occurred in this District.

## PARTIES

**6.**     Plaintiff, Allan R. Miller ("Mr. Miller"), is a citizen and resident of Iowa.

**7.**     Plaintiff, Cheryl A. Miller ("Mrs. Miller") is a citizen and resident of Iowa.

**8.**     Defendant Austin Lloyd, Inc. ("ALI") is a privately-held corporation organized under the laws of the State of New York with its principal place of business located in Suffolk County, New York with a physical business address at 48 S. Service Road, Melville, NY 11747.

**9.**     Defendant P. White Holdings, LLC ("PWH") is a limited liability company organized under the laws of the State of New York with its principal place of business located in Suffolk County at 48 S. Service Road, Melville, NY 11747.

**10.**     Defendant Patrick J. White ("White") is a New York citizen and resident of Suffolk County, New York with a last known residential address at 3 Sweet Hollow Road, Huntington, NY 11743-6530 and a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747.

3

11.     Defendant Mike Todd ("Todd")[2] is an alias[3] for Patrick J. White and other telemarketing sales agents at ALI, all of whom are New York citizens and residents of Suffolk County, New York, with a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747.

12.     Defendant Sean Klein ("Klein") is a New York citizen and resident of Suffolk County, New York, with a last known residential address at 60 Locust Lane Northport, NY 11768 and a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747.

13.     Defendant Christopher M. Paradise ("Paradise") is a New York citizen and resident of Suffolk County, New York, with a last known residential address at 12 Mallard Cove, Centerpoint, NY 11721-1641 and a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747.

14.     Defendant Brandon E. Chancey is a New York citizen and resident of Suffolk County, New York, with a last known residential address at 49 Franklin Street, Northport, NY 11768-3058 and a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747.

15.     Defendant David Schmidt ("Schmidt') is a New York citizen and believed to be a resident of Suffolk County, New York, with a business address in Suffolk County at 48 S. Service Road, Melville, NY 11747.

---

[2] On information and belief, "Mike Todd" is a fictitious name used by ALI telemarketing sales agents to make it difficult, if not impossible, for victims of telemarketing fraud to plead their claims with specificity. According to Wikipedia, Michael "Mike" Todd (born Avrom Hirsch Goldbogen) was an American theater and film producer and the third husband of actress Elizabeth Taylor. Apparently, the ALI-associated Defendants use the *nom-de-fraud* "Mike Todd" because "John Doe" is too obvious.

[3] There is recorded precedent for fraudulent coin dealers and telemarketers to use aliases when interacting with customers/consumers. *See United States v. Romano,* No. 09-CR-168 (SJ) (VMS), 2013 U.S. Dist. LEXIS 208446, at *20 n.6 (E.D.N.Y. 2013) ("Michelle Stumpf testified at trial that the Defendants and their salespeople used false names when interacting with customers").

## INTRODUCTION

16.     The Plaintiffs Allan R. Miller and Cheryl A. Miller are an elderly married couple who reside in Ankeny, Iowa. Mr. Miller retired in 2004. Following his retirement, between the years 2004 and 2018, Mr. Miller collected an inventory of various gold and silver coins.

17.     ALI markets and sells collectible numismatic, semi-numismatic and bullion coins directly to consumers over the telephone and via the internet in collaboration with PWH and under the direction and control of Paradise, White, Klein, Schmidt and Todd, the principal owners and persons in control of ALI and PWH, who manage, operate and treat ALI and PWH as their personal bank accounts in such a way that ALI and PWH are their alter egos because corporate formalities are not followed and separate and distinct books and records are not maintained. ALI and PWH are undercapitalized, and the line between their owner(s)/manager(s) and the entities is substantially blurred to the point that it is difficult, if not impossible, to determine where the individual Defendants end and ALI and PWH begin. ALI and PWH exist as mere tools and business conduits for Paradise, White, Klein and Schmidt (and Todd) (and possibly other owners) which has resulted in an injustice to the Millers and the diminution of available resources from which they may obtain satisfaction of the damages directly and/or proximately caused by Defendants' wrongful conduct.

18.     Between approximately May 2, 2022 and June 5, 2022, via telephone, ALI and PWH principals and representatives, Chancey, Todd, and Klein, along with other ALI representatives "John" and "Mr. Hines,"[4] and later Paradise and White, teamed up to work a scam on Mr. Miller

---

[4] Mr. Miller's recollection of speaking with a "Mr. *Hines*" is almost certainly a reference to his unpleasant telephone interactions with *Klein*.

in which they convinced him to ship the Millers' entire coin inventory consisting of five (5) boxes of coins to ALI for individual grading, appraisal and valuation and potential purchase by ALI.

19.      Subsequently, as set out below in more detail, once ALI was in possession of the Millers' coins, ALI offered Mr. Miller a ridiculously small amount for the coins and, when he declined to sell and demanded that ALI return the coins to him, refused to return them. On information and belief, ALI either is still in possession of the Millers' coins or else ALI has marketed and sold the Millers' coins without permission or authorization. The result is that Chancey, Todd, Klein, Paradise, and White, as well as other unidentified or semi-identified ALI representatives (e.g. "John" and "Mr. Hines"), with the knowledge and approval of another ALI principal, Schmidt, swindled the elderly Millers out of their coin inventory worth at least Ninety-Two Thousand Dollars ($92,000.00).

20.      Despite the Millers' repeated protestations and oral and written demands, to date ALI has never returned the five (5) boxes of the Millers' coin inventory to them, and ALI either wrongfully retains the Millers' coins in its possession without authorization or claim of right or else has converted the coins to ALI's wrongful financial benefit and the wrongful financial benefit of PWH and the individual Defendants, Paradise, Chancey, White, Todd, Klein and Schmidt.

## **FACTUAL BACKGROUND**

### A.  **The Predatory Precious Metals Market**

21.      The precious metals industry is highly complex and nuanced, making it the ideal market for deceptive and fraudulent activity. Precious metals are naturally-occurring metals that carry a high economic value, often due to scarcity or global demand. These metals, including gold, silver, platinum, and palladium, can be sold as physical assets, in the form of bars, bullion, or coins, or as futures contracts or other speculative investments. Although precious metals prices are volatile,

they tend to increase during economic turmoil and stabilize during more prosperous times as contrasted with the price fluctuations experienced by more traditional investment products, including stocks, bonds, and real estate. It is common to see financial reports and media headlines touting the gains in value experienced by precious metals when contrasted against poor yields in other investments during times of economic uncertainty. Interestingly, this market is largely unregulated as "precious metal dealers fall 'within a 'gap'' in the federal regulatory system."[5] For several decades, fraudsters, sharp operators, and con men have taken advantage of this lack of regulation to lure unsophisticated and trusting customers into purchasing precious metals at prices so far above the fair market value as to nullify any reasonable return on investment, thereby resulting in devastating losses of elderly customers' life savings and leaving them with no recourse or chance of recovery.

22.     While there are upstanding, reputable precious metals dealers, a criminal subset (the "coin *fraud* industry"), operating in the penumbra of the reputable dealers, has been a longstanding problem. In late 1983 and early 1984, federal and state authorities initiated a long-awaited crackdown on precious metals dealers operating fraudulent "boiler room" schemes across the country. These precious metals fraudsters and racketeers had bilked investors out of several hundred million dollars.[6] Banking on customers' lack of knowledge, and using the nuances of coin collecting, grading, historical factors and mint populations, unethical coin dealers continue to

---

[5]  *See* David J. Gilberg, *Precious Metals Trading-The Last Frontier of Unregulated Investment*, 41 Wash. & Lee L. Rev. 943 (1984) (https://scholarlycommons.law.wlu.edu/wlulr/vol41/iss3/4) for an interesting overview of the precious metals' trading industry.

[6]  *See Commodity Investment Fraud II, Hearings Before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs,* 98th Cong., 2d Sess. 145-88 (1984)*; see also War on Florida Boiler Rooms,* N.Y. Times, Nov. 14, 1983; *Regulating Bullion Dealers,* N.Y. Times, Oct. 31, 1983; *Senate to Study Gold Dealers,* N.Y. Times, Oct. 27, 1983; *Bullion Fraud: Who Protects the Investor?,* Chicago Tribune, Oct. 25, 1983.

confuse and confound the reasonable consumer with deceptive claims of significant investment returns and bargains, often rising to the level of, and culminating in, outright fraud and counterfeiting. The complexities and unfamiliarity of the precious metals industry to the normal consumer provide fertile ground for fraudulent schemes such as those executed by Defendants and experienced to the great detriment of the Millers.[7]

23.     The ploys used by the Defendants have been condemned by the United States Senate and various Federal and State agencies and commissions. Nine years ago in 2014, a United States Senate Special Committee on Aging conservatively estimated that more than "*10,000 Americans have been victimized through these schemes, with losses around $300 million.*"[8] Unfortunately, while federal and state regulators continue to aggressively pursue the worst actors in the industry, *"many other bad actors are able to continue their shady dealings with impunity."*[9] In other words, these coin fraud schemes have not abated, and dealers such as the Defendants continue to victimize unsuspecting, elderly customers such as the Millers.

24.     The Federal Trade Commission has testified before the United States Senate that it had "*observed a proliferation of schemes targeting financially-distressed consumers. These schemes have included deceptive telemarketing operators posing as "brokers" and offering precious metals as purported high-profit, low-risk investments. By failing to disclose key information about the investments' terms and high costs, these brokers deceive consumers into believing that the*

---

[7]  *See* note 5, *supra*. In 2010, the FTC identified and described precious metal fraud schemes identical to those at issue here. *See* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-precious-coins-and-bullion-disclosure-act/100923coinsbulliamact.pdf.

[8]  *See Exploring the Perils of the Precious Metals Market*, U.S. Senate Special Committee on Aging, *https://www.aging.senate.gov/download/precious-metals-market-committee-staff-investigation*, at 17 (hereinafter "US Senate Report").

[9]  US Senate Report at 3.

*investments provide a safe and secure vehicle for savings. Sadly, many Americans have lost their life savings to these unscrupulous operations*"[10] as have, unfortunately, the Millers.

25.     The Commodities Futures Trade Commission and numerous States' Attorneys General have filed numerous actions attempting to curtail illegal over-charging for precious metal products.[11] The New York Attorney General has published a consumer alert specifically warning against "**Coin Swindles**" in which she warns that: "*[s]o called 'rare coins' are often sold to unwary investors who are led to believe that they are a good investment that will increase in value over the years. Representations made about the expected increase in the value of these coins are almost always untrue and part of a scam perpetrated against unsophisticated, often elderly victims*."[12] However, even though these Federal and State agencies have stepped up enforcement actions*, "many unscrupulous precious metal dealers are still able to cheat customers due to a lack of transparency within the industry and relatively little monitoring of their business practices."*[13]

26.     Government actors aside, the legitimate precious metals industry, comprised of professional numismatists, financial analysts, and reputable dealers, recognizes the creeping taint of fraudulent over-selling of precious metals. In 2019, the Professional Numismatists Guild[14]

---

[10]  *See* https://www.ftc.gov/legal-library/browse/prepared-statement-federal-trade-commission-exploring-perils-precious-metals-market; and
https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-precious-coins-and-bullion-disclosure-act/100923coinsbulliamact.pdf.

[11]  *See, e.g.*, http://metalsandbarrickcapitalreceivership.com/wp-content/uploads/2020/10/Complaint.pdf.

[12] *See* https://ag.ny.gov/common-investment-scams. Other state attorneys general have also issued precious metals fraud consumer alerts. *See, e.g.,* https://www.texasattorneygeneral.gov/consumer-protection/investing-gold-coins (Texas) and
https://www.ag.state.mn.us/consumer/publications/CoinDealers.asp  (Minnesota).

[13]  US Senate Report at 3.

[14]  The Professional Numismatists Guild (PNG) is a highly regarded nonprofit organization composed of the country's top numismatic experts who adhere to a strict code of ethics in the buying and selling of numismatic items.  *See* www.pngdealers.org.

("PNG"), issued warnings about grossly overpriced gold coins.[15] The PNG and the American Numismatic Association ("ANA") developed acceptable industry standards for selling and pricing of the various types of precious metal products. Industry associations have defined limits as to what constitutes a legitimate sales mark-up on precious metal coins to assist consumers to avoid the traps laid by fraudsters. For example, the National Futures Association ("NFA") advises that gold bullion should not be purchased at more than 5-10% above spot price.[16]

### B. The Coin Fraudsters Prey Upon the Elderly.

**27.** The U.S. Senate Report revealed that the "*overwhelming number of victims in precious metal fraud are seniors.*"[17] Likewise, the FBI found that corrupt coin dealers intentionally target the elderly specifically "*because they [are] elderly and [the dealers] thought [they] could get away with it*" and that, while the amounts defrauded as to any individual elderly customer may seem small in comparison to certain other more high profile financial frauds, "*it represents a great deal to the victims – it was one man's life savings.*"[18] During criminal prosecution of similar operators, the depth of the callousness toward the elderly was revealed as the fraudsters' "avowed sales tactics were to 'crush weak people' and to 'confuse the s**t' out of 'older people'" and that the salespeople would make fun of the victims because they were old and easier to convince, and the elderly were "easier to push around," as the fraudsters would tell jokes and push the sales staff to sell even more coins to a victim who showed susceptibility to pressure and

---

[15] *See* https://www.numismaticnews.net/world-coins/beware-of-grossly-overpriced-gold-coins.

[16] The NFA adopted the U.S. Commodities Futures Trade Commission's bright line limits. *See* https://www.nfa.futures.org/investors/investor-newsletters/January-2021.html.

[17] *See* US Senate Report at 16.

[18] *See Fraudster Targeted Elderly Victims*" https://www.fbi.gov/news/stories/the-case-of-the-corrupt-coin-dealer.

manipulation.[19]  In fact, most of the fraud advisories and enforcement actions by the Federal and State agencies focus on the financial exploitation of the elderly at the hands of fraudulent coin dealers.[20] True to form, the Defendants in this case targeted the elderly Mr. and Mrs. Miller.

### C.  The Defendants Use Misleading and False Marketing Claims.

**28.**     Relying upon market complexity and lack of oversight of the precious metals industry to their benefit and to their unwitting customers' detriment, Paradise, White, Klein, Chancey, Schmidt and Todd, in their individual capacities as well as their capacities as principals and representatives of ALI and PWH, practice a subterfuge upon naïve and unsuspecting customers/consumers. They operate their telemarketing operation for the sole purpose of selling collectible numismatic, semi-numismatic and bullion coins[21] directly to customers/consumers over the telephone (and/or via the internet and print media advertisement), and, in this case, wrongfully obtaining coins under the guise of grading and valuating the coins while, in reality, stealing those coins. Paradise, White, Klein, Chancey, Schmidt and Todd, in their individual capacities as well as their capacities as principals and representatives of ALI and PWH, make many hundreds of intrastate and interstate sales calls per month — via the telephone — utilizing one or more of the following unlawful, false, misleading, and unconscionable high-pressure sales tactics typical of the precious metals/coins/bullion direct sales industry. These unscrupulous sales practices are specifically designed to prevent the customer/consumer from making informed decisions.

---

[19]   *See United States v. Romano*, No. 09-CR-168 (SJ) (VMS), 2013 U.S. Dist. LEXIS 208446, at *19 n.5 (E.D.N.Y. 2013).

[20]   *See, e.g.,* https://dfpi.ca.gov/2022/02/01/dfpi-sues-to-stop-68-million-precious-metals-and-coin-fraud-targeting-elderly/.

[21]   In this context, the term "numismatic coin" refers to collectible coins whose value is based upon other qualities in addition to the metal content of the coin, such as appearance, population, grade, rarity, and other attributes.   "Semi-numismatic coin" refers to a coin whose value partially derives from its numismatic value and mainly from the value of its precious metal content.   "Bullion coins" derive their value almost entirely from the fair market value of the precious metal content, commonly referred to as the "spot value."

a. **Misrepresentations of "High-Reward/Low-Risk" Safe Investments:**

(1)     Claiming that precious metal coins are safe, secure investments that promise significant returns but failing to disclose that the significant markup or fees charged at the time of purchase created a substantial loss of the customer's/consumer's investment simultaneously with the purchase and that the customer/consumer would never recover because the precious metal products would have to appreciate to historical highs that have never been realized just for the customer/consumer to break even;

(2)     Claiming that certain coins are "rare," "valuable," and provide a "better" investment, when in truth such coins have limited numismatic and collectible value (if any) while at the same time ignoring the significant and immediate cost imposed on customers/consumers in the form of fraudulent pricing;

(3)     Claiming that the coins possessed certain qualities and will substantially appreciate quickly with full knowledge that such representations are false and misleading;

(4)     Representing that the coins being offered will outperform other types of investments—without any underlying data to support such assertions;

(5)     Claiming that precious metals represent a "safe haven" in a volatile economic market;

(6)     Claiming guaranteed high returns on the contemplated investment in precious metals, when in truth there is no way to predict the future rate of return on precious metals;

(7)     Convincing the customer/consumer to trade previously-purchased coins for other coins with representations that the customer/consumer will thereby attain a better investment position, when, in fact, the trade results in the customer/consumer experiencing even greater losses;

(8)     Misrepresenting that the customer/consumer benefited from "special pricing" and "early low prices" when the customer/consumer actually paid significant markups (margins) on the coins;

(9)     Misrepresenting that the customer/consumer would realize unusually high rates of return on investment due to various fictitious market conditions;

(10)    Misleading the customer/consumer with false representations as to the "no tax" aspects of precious metal coins by representing that the increased value of such coins are "tax-free" and that the customer/consumer is thereby avoiding tax on the appreciation or rate of return earned and/or misleading the customer/consumer to buy or trade for pre-1933 gold coins and representing that by making such purchases or trades the customer/consumer would avoid tax issues and liability;

(11)    Claiming that investments in numismatic and modern graded bullion are non-reportable or "tax-free" when in truth customer/consumer must ultimately pay taxes on capital gains, irrespective of the classification of the coins;

(12)    Upselling customers/consumers from bullion to numismatics via representations that numismatic coins provide a better investment than bullion when there is no historical basis, much less reliable data, to support that claim;

(13)    Offering a "no-risk money back guarantee" that either is illusory or has significant fees attached to it.; and

(14)    Failing to tell customers/consumers is that the precious metal coins have been marked up over 40% of the market value of the metal and will be bought back at the market value (usually less than melt value) less a liquidation fee or commission.[22]

**b.  Misrepresenting the availability of the "rare" precious metal coins:**

(1)    Pressuring the customer/consumer into believing the need to purchase at a purported substantial discount was "immediate" and that the customer/consumer had to "act right away" to achieve large profits or else lose a good deal and that the coins are elusive and will soon become unavailable, thereby creating a sense of urgency for the customer/consumer to consummate the sale; and

---

[22] The State of California has cited an undisclosed 33% markup by Lear Capital as fraudulent. *See California v Lear,* https://docs.simpluris.com/websites/13abd9da-de42-4adb-8903-54649f9c5695/documents/fcc995e5-6132-42f9-8608-aea59c728a84/CA%20Complaint(11118433.2).pdf.

(2)    Misrepresenting that numismatics are preferred over precious metals bullion because there is at risk of bullion being "confiscated" by the government[23] when there is no current law under with the government can recall gold nor any way to predict that any item is immune from a theoretical future recall, thereby creating immediate pressure for the customer/consumer to move into numismatics instead of bullion.

**c.  Misrepresenting the value of the precious metal numismatic coins:**

(1)    Utilizing data from other, similar numismatic coins that have significantly different attributes and qualities to represent that the coin being purchased is of greater value or potential value than its actual fair market value;

(2)    Misrepresenting that the coin is "rare" or of limited population when the populations used are presented in such a way as to mislead or deceive customers;

(3)    Mis-grading or "upgrading" the coin to justify fraudulent markups; and

(4)    Failing to disclose that the purchase price is over 40% (and often significantly higher) above the market value of the coins and that any return or resell of the coin will be for less than the market value.

**d.  Misrepresenting their expertise, experience, and qualifications:**

(1) Falsely claiming that they possess expert knowledge, qualifications, and experience in precious metals when they do not; and

(2) Falsely claiming that they have specialized financial investment knowledge and experience regarding the precious metals market when they do not.

**e.  Taking, selling or charging for coins without authority:**

(1)    Illegally charging the customer's/consumer's credit card or banking account information obtained via prior transactions to ship (or, even worse, without shipping) coins

---

[23] This ploy is based upon President Franklin Roosevelt's 1933 executive order, in which the government recalled most of the gold owned by private citizens but provided an exception for "rare and unusual coins." https://www.presidency.ucsb.edu/documents/executive-order-6102-requiring-gold-coin-gold-bullion-and-gold-certificates-be-delivered. Historically criticized, it was repealed in 1974 by President Gerald Ford. *See* https://www.cmi-gold-silver.com/gold-confiscation-1933/.

to the customer/consumer without her permission or authority and then, when confronted, making false representations to confuse and obfuscate the issues;

(2)     Fraudulently obtaining the customer's/consumer's precious metal coins by offering to "resell" or "auction" the customer's coin collection "on consignment" with no intent of reselling or auctioning the coins, but instead, after receiving the coins from the customer, converting (stealing) the coins for their own use and benefit;

(3)     Fraudulently obtaining the customer's/consumer's precious metal coins by "baiting" customers with claims that the customer's/consumer's coins were worth a great amount, then after receiving shipment of the coins from the customer/consumer under the guise of grading, appraising and valuating the coins, switching the story and paying the customer/consumer either nothing or only a fraction of the prior estimated value;

(4)     Fraudulently obtaining the customer's/consumer's precious metal coins by claiming some economic or social upheaval (e.g., the COVID pandemic) had created a unique opportunity to sell or buy precious metals, but then only paying the customer/consumer only a fraction of the represented value of the coins; and

(5)     Agreeing to buy the customer's/consumer's coins or broker sale of the coins but, after obtaining possession of the coins, failing to honor that agreement.

**f.   Stalling or confusing customers to keep them from discovering or realizing the fraud:**

(1)     Forestalling customer/consumer complaints by utilizing the false pretext that they will broker the resale or auction of the customer's/consumer's coins for a substantial profit, when such inducement was merely intended to stonewall the customer/consumer, obfuscate the transactions, and delay discovery of the fraudulent purchase price at which the coins were sold in the first instance;[24]

(2)     Misrepresenting the present market value of the purchased coins to prevent or delay the customer/consumer from determining the actual market price of the coins; and

---

[24] On information and belief (and based on past experience), when discovery does begin, the Defendant coin dealers will claim that they no longer have any relevant documents concerning the transactions at issue (including cost of goods sold, commissions paid to their telemarketer agents on the sales, or any other documents).

**g. Various other acts and practices that may be uncovered during discovery.**

29.    Paradise, White, Klein, Chancey, and Todd, in their individual capacities as well as their capacities as principals and representatives of ALI and PWH, utilized, and continue to utilize, one or more of the foregoing unlawful, deceptive, false, misleading and unconscionable sales and business tactics (which have been identified as fraudulent and prosecuted by various governmental entities) as part of ALI's and PWH's daily on-going business model conducted at the direction of and under the control of Paradise, White, Klein and Schmidt. More specifically, Chancey's, Todd's, Klein's, Paradise's and White's numerous misrepresentations to Mr. Miller, in their individual capacities as well as their capacities as principals and representatives of ALI and PWH, are neither isolated incidents nor unique to Mr. Miller's interactions and experiences with ALI and PWH. Rather, utilizing these deceptive and fraudulent tactics, ALI and PWH, at the direction of and under the control of Paradise, White, Klein, Todd and Schmidt, have stolen and converted coins from numerous other customers over the course of multiple years and continue to do so.

30.    ALI and PWH, at the direction of and under the control of Paradise, White, Klein, Todd and Schmidt, through various telemarketer employees/sales agents, including Chancey and Todd, as well as White, Paradise, and Klein themselves, make thousands of intrastate and interstate telephonic sales calls per month and ship coins—and have coins shipped to ALI—by the interstate mails and private interstate delivery services. Using various unscrupulous techniques that prey upon unsuspecting consumers, such as the Millers, with little or no knowledge of the intricacies and nuances of numismatics and the precious metals industry and trick or cajole such consumers to ship coins from the consumers' possession to ALI under the guise of grading, appraising, valuating, buying, auctioning, and selling on consignment, all of which are flavors of the same sham to convert and steal the consumers' coins for the unlawful financial benefit of ALI, PWH,

and their principals and representatives, Paradise, White, Klein, Todd, Chancey and Schmidt. Many times, the Defendants confuse the consumer through a series of exchanges of coins claiming larger profits with different coins, or fail to properly account for coins shipped back to the Defendants claiming they never received the coins, or hold coins of the client "on account" claiming to utilize these assets for trade on other "special" coins or to place such assets in upcoming auctions that never occur then never return the funds or the coins.

### D.  **Defendants' Fraudulent Scheme Against the Millers**

**31.**     In or about May 2022, Defendants began working their con game upon the Millers.

**32.**     On **May 2, 2022**, Chancey telephoned Mr. Miller and attempted to convince him to sell the Millers' entire coin inventory to ALI for a "guaranteed price." Mr. Miller told Chancey that he would consider selling the entire coin inventory to ALI with the proviso that ALI individually grade and appraise/valuate each coin before he would agree to consummate the transaction. Both Chancey and Todd orally agreed on behalf of ALI that the Millers' coins would be individually graded for appraisal/valuation. In reliance upon Chancey's and Todd's representations, the Millers agreed to ship their entire coin inventory to ALI. The inventory included sets of Morgan silver dollars (some 390+ coins) and Franklin silver half-dollars (280 coins with mint marks P and D, uncirculated, dated between 1957 and 1963).

**33.**     On or about **May 3, 2022**, the Millers shipped five (5) boxes of coins to ALI in New York via Federal Express.

**34.**     On **May 6, 2022,** Chancey called to tell Mr. Miller that ALI would only offer $19,000.00 for the entire inventory of five (5) boxes of coins which Mr. Miller had determined to be worth at least $92,000.00. Chancey also informed Mr. Miller that, contrary to his express condition that ALI individually grade and valuate the coins, ALI never did individual coin valuations. Rather,

Chancey explained, Mr. Miller's coins had been graded in bulk like bullion and without any consideration of the coins' individual attributes. Mr. Miller refused Chancey's low-ball offer and demanded that ALI ship the five (5) boxes of coins back to him. Chancey then countered that ALI would conduct a second evaluation and get back to him.

35.     Subsequently, a few days later in **May 2022**, Chancey telephoned Mr. Miller and informed him that ALI's $19,000.00 offer to buy the Millers' coin inventory had not changed after the second evaluation. Mr. Miller again demanded that ALI return the five (5) boxes of coins.

36.     On **May 11, 2022**, rather than return the coins, ALI had a "Mr. Hines"[25] (who claimed to be one of ALI's owners) talk to Mr. Miller on the telephone. "Mr. Hines" (i.e. Klein) tells Mr. Miller that if he had paid $92,000 for the five (5) boxes of coins at issue, then he "had been screwed by other coin dealers."[26] "Mr. Hines" (i.e. Klein) then offered to send the Millers five (5) Jennie Norris $10 Gold American Eagles[27] as consolation in exchange for the Millers' coin inventory and hung up the phone.

---

[25] Although Mr. Miller remembers a conversation with a "Mr. Hines" is clearly intended to mean a conversation with ALI's principal, Klein.

[26] *See* note 19, *supra*. ALI and its principals and representatives seem to take particular joy in defrauding and humiliating elderly customers such as Mr. Miller. This comports with the evidence adduced at the criminal RICO trial against Michael Romano and William Kearney:

Patrick Coleman, Defendants' former employee, testified at trial that . . . Mr. Kearney's avowed sales tactics were to "crush weak people" and to "confuse the shit" out of "older people." . . . Daren Mutone, a former employee of Atlantic Coin Galleries, testified at trial that the Atlantic Coin Galleries salespeople would make fun of the victims because they were old and easier to convince. . . . Mr. Mutone testified that the elderly were "easier to push around," and that Mr. Romano and Mr. Kearney would hear the jokes and push the sales staff to sell even more coins to a victim who showed susceptibility to pressure and manipulation.

*United States v. Romano*, No. 09-CR-168 (SJ) (VMS), 2013 U.S. Dist. LEXIS 208446, at *19 n.5 (E.D.N.Y. 2013).

[27] By way of rough comparison, the five (5) "Jennie Norris $10 Gold American Eagles" offered by "Mr. Hines" (i.e. Klein) would have a combined market value in May 2022 of just approximately $3,300.00.

37.     On **May 18, 2022**, Mr. Miller spoke on the telephone with Todd, "the fixer" for ALI. Todd requested email documentation that ALI had agreed to individually grade and valuate the Millers' coins. Mr. Miller provided the requested documentation via email to Todd. After several failed send attempts, Todd received Mr. Miller's email on **May 24, 2022.**

38.     On **May 27, 2022**, Mr. Miller spoke with Chancey on the telephone, and he promised to call Mr. Miller back on May 31, 2022. However, Chancey never called Mr. Miller back, and that was the last time Mr. Miller spoke with Chancey.

39.     On **May 31, 2022**, Mr. Miller spoke on the telephone with Paradise who told Mr. Miller that he would talk with Todd on June 3, 2022 about the dispute over the Millers' coin inventory. Paradise also told Mr. Miller that contrary to any representations made to Mr. Miller regarding individually grading/evaluating their coin inventory, ALI never grades individually when purchasing coins but rather grades purchases based on "spot price" or "bullion value" for a lump sum dollar price.

40.     On **June 3, 2022**, Mr. Miller spoke with Todd on the telephone for over an hour. During this conversation, Todd lied and claimed that Mr. Miller had signed a sales agreement with ALI for the coin inventory. Mr. Miller denied signing any sales agreement. Although Todd told Mr. Miller that he would forward Mr. Miller emails demonstrating the sales agreement, he never did. Todd also told Mr. Miller that ALI would return the five (5) boxes of the Millers' coin inventory to the Millers.

41.     On **June 5, 2022**, Mr. Miller wrote to Todd, documenting the details of their June 3, 2022 telephone conversation and again demanding the ALI return the five (5) boxes of the Millers' coin inventory. Over a year later, ALI and its principals and representatives still have never returned the Millers' coins.

42.     Based upon information and belief, ALI's and its principals' and representatives' coin schemes, such as the conversion of the Millers' coin inventory, are neither isolated incidents nor are they unique to the Millers. Using these same fraudulent tactics to con consumers/customers to ship coins to ALI for purchase, appraisal, valuation, auction, and/or consignment sale, these Defendants have defrauded the Millers and other elderly and unsuspecting consumers/customers by converting and stealing their coins under false pretenses and continue to do so, thereby indicating a continuing open-ended pattern of criminal fraudulent conduct. Published reports from the Better Business Bureau and Business Consumer Alliance indicate that in 2019 and 2021, other consumers were raising the same claims of fraud and illegitimacy described above against these Defendants. Such companies do not stop without government intervention or judicial intervention. To this day, the Defendants continue to operate their enterprises in the same fashion and utilizing the same fraudulent, bullying, harassing, high-pressure techniques and schemes which pose a threat of continued criminal activity.

43.     It is patently obvious that the Defendants' goal from day one was to run a confidence scheme and steal the Millers' coin inventory. As a direct and/or proximate result of Defendants' above-described wrongful acts and practices, the Millers suffered (and continue to suffer) substantial economic damages, which Defendants refuse to remedy. This case has resulted.

## CLAIMS FOR RELIEF/CAUSES OF ACTION

### COUNT I

**MAIL FRAUD AND WIRE FRAUD**
**A Pattern of Unlawful Activity Under 18 U.S.C. § 1961, et seq.**
**(as against RICO Persons PARADISE, WHITE, SCHMIDT,**
**CHANCEY, TODD and KLEIN)**

44.     The preceding factual statements and allegations are incorporated by reference and re-alleged as if fully set forth at length.

**RICO PERSON Christopher M. Paradise:**

**45.**    Christopher M. Paradise (RICO Person) conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises, Austin Lloyd, Inc. and P. White Holdings, LLC, through a continuous pattern of racketeering activity; to wit: Paradise participated, directly and indirectly, with White, Schmidt, Todd, Chancey, Klein and others, and together they acted with, by and through various employees, representatives and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 that generated multiple and repeated fraudulent and unlawful coin transactions with the Millers and other telemarketing consumers/customers that, in turn, generated exorbitant compensation for Paradise. In association with White, Schmidt, Todd, Chancey and Klein, Paradise caused ALI (RICO Enterprise) and PWH (RICO Enterprise)  to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts, offers to buy, broker, sell or auction coins and/or other purchase confirmations to the Millers and numerous other of ALI's telemarketing customers.

**46.**    By his unlawful acts, Christopher M. Paradise (i) conducted and/or participated in the affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) in violation of 18 U.S.C. § 1962(c) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)) and defrauded the Millers and other telemarketing customers in the process. Paradise committed these substantive RICO offenses by causing ALI (RICO Enterprise) and PWH (RICO Enterprise) to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself, White, Schmidt, Todd, Chancey, Klein, and possibly others unknown at this time. Paradise knew that making and/or sending fraudulent solicitations, sales receipts, offers to buy or

broker sales and/or purchase confirmations to the Millers and other telemarketing customers was fraudulent, misleading, and unlawful. Paradise knew such wrongful acts and practices would result in the conversion and theft of the Millers' coin inventory and the coins of other telemarketing consumers/customers that, in turn, would generate exorbitant compensation for himself. Paradise engaged in the scheme to take unfair advantage of the Millers and other consumers/customers. Paradise's wrongful acts proximately and/or directly caused substantial damages to the Millers and other telemarketing consumers/customers.

**RICO PERSON Patrick J. White:**

47.      Patrick J. White (RICO Person) conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises Austin Lloyd, Inc. and P. White Holdings, through a pattern of racketeering activity; to wit: White participated, directly and indirectly, with Paradise, Schmidt, Todd, Chancey, Klein and others, and together they acted with, by, and through various employees, representatives and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 that generated multiple and repeated fraudulent and unlawful coin transactions with the Millers and other telemarketing consumers/customers that, in turn, generated exorbitant compensation for White. In association with Paradise, Schmidt, Todd, Chancey and Klein, White caused ALI (RICO Enterprise) and PWH (RICO Enterprise) to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts, offers to buy, broker, sell or auction coins and/or other purchase confirmations to the Millers and numerous other of ALI's telemarketing customers.

48.      By his unlawful acts, Patrick J. White (i) conducted and/or participated in the affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)) and

22

defrauded the Millers and numerous other of Defendants' telemarketing consumers/customers in the process. White committed these substantive RICO offenses by causing ALI (RICO Enterprise) and PWH (RICO Enterprise) to engage in multiple predicate acts of mail fraud and wire fraud— all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself, Paradise, Schmidt, Todd, Chancey, Klein and possibly others unknown at this time. White knew that making and/or sending fraudulent solicitations, sales receipts, offers to buy or broker sales and/or purchase confirmations to Miller and other telemarketing customers was fraudulent, misleading, and unlawful. White knew such wrongful acts and practices would result in the conversion and theft of the Miller's coin inventory and the coins of other telemarketing consumers/customers that, in turn, would generate exorbitant compensation for himself. White engaged in the scheme to take unfair advantage of the Millers and numerous other of Defendants' telemarketing consumers/customers. White's wrongful acts proximately and/or directly caused substantial damages to the Millers and other telemarketing consumers/customers.

**RICO PERSON David Schmidt:**

**49.**     David Schmidt (RICO Person) conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises Austin Lloyd, Inc. and P. White Holdings, LLC through a pattern of racketeering activity; to wit: Schmidt participated, directly and indirectly, with White, Paradise, Todd, Chancey, Klein and others, and together they acted with, by, and through various employees, representatives, and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 that generated multiple and repeated fraudulent and unlawful coin transactions with the Millers and other telemarketing consumers/customers that, in turn, generated exorbitant compensation for Schmidt. In association

with White, Paradise, Todd, Chancey and Klein, Schmidt caused ALI (RICO Enterprise) and PWH (RICO Enterprise)to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts, offers to buy, broker sell or auction coins and/or other purchase confirmations to the Millers and numerous other of Defendants' telemarketing consumers/customers.

**50.**     By his unlawful acts, David Schmidt (i) conducted and/or participated in the affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)) and defrauded Miller and other telemarketing consumers/customers in the process. Schmidt committed these substantive RICO offenses by causing ALI (RICO Enterprise) and PWH (RICO Enterprise) to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself, White, Paradise, Todd, Chancey, Klein and possibly others unknown at this time. Schmidt knew that making and/or sending fraudulent solicitations, sales receipts, offers to buy or broker sales and/or purchase confirmations to the Millers and other telemarketing customers was fraudulent, misleading and unlawful. Schmidt knew such wrongful acts and practices would result in the conversion and theft of the Millers' coin inventory and the coins of other telemarketing consumers/customers that, in turn, would generate exorbitant compensation for himself. Schmidt engaged in the scheme to take unfair advantage of the Millers. Schmidt's wrongful acts proximately and/or directly caused substantial damages to the Millers and other telemarketing consumers/customers.

**RICO PERSON Mike Todd:**

**51.**    Mike Todd[28] (RICO Person) conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises Austin Lloyd, Inc.  and P. White Holdings, through a pattern of racketeering activity; to wit: Todd participated, directly and indirectly, with White, Schmidt, Paradise, Chancey, Klein and others, and together they acted with, by, and through various employees, representatives and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 that generated multiple and repeated fraudulent and unlawful coin transactions with the Millers and numerous other of Defendants' telemarketing customers that, in turn, generated exorbitant compensation for Todd. In association with White, Schmidt, Paradise, Chancey and Klein, Todd caused ALI (RICO Enterprise) and PWH (RICO Enterprise) to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts, offers to buy, broker, sell or auction coins and/or other purchase confirmations to the Millers and numerous other of Defendants' telemarketing customers.

**52.**    By his unlawful acts, Mike Todd (i) conducted and/or participated in the affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)) and defrauded the Millers and numerous other of Defendants' telemarketing consumers/customers in the process. Todd committed these substantive RICO offenses by causing ALI (RICO Enterprise) and PWH (RICO Enterprise) to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself, White, Schmidt, Paradise, Chancey, Klein and possibly others unknown at this time. Todd knew that making and/or sending fraudulent solicitations, sales receipts, offers

---

[28] *See* note 2, *supra.* "Mike Todd" is a fictitious person and/or alias used by multiple ALI telemarketers.

to buy or broker sales and/or purchase confirmations to the Millers and other telemarketing customers was fraudulent, misleading, and unlawful. Todd knew such wrongful acts and practices would result in the conversion and theft of the Millers' coin inventory and the coins of other telemarketing consumers/customers that, in turn, would generate exorbitant compensation for himself. Todd engaged in the scheme to take unfair advantage of the Millers. Todd's wrongful acts proximately and/or directly caused substantial damages to the Millers and numerous other of Defendants' telemarketing consumers/customers.

**RICO PERSON Brandon E. Chancey:**

53.     Brandon E. Chancey (RICO Person) conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises, Austin Lloyd, Inc. and P. White Holdings, LLC, through a continuous pattern of racketeering activity; to wit: Chancey participated, directly and indirectly, with Paradise, White, Schmidt, Todd, Klein and others, and together they acted with, by, and through various employees, representatives, and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 that generated multiple and repeated fraudulent and unlawful coin transactions with the Millers and other telemarketing consumers/customers that, in turn, generated exorbitant compensation for Chancey. In association with Paradise, White, Schmidt, Todd, and Klein, Chancey caused ALI (RICO Enterprise) and PWH (RICO Enterprise)  to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts, offers to buy, broker, sell or auction coins and/or other purchase confirmations to the Millers, and numerous other of ALI's telemarketing consumers/customers.

54.     By his unlawful acts, Brandon E. Chancey (i) conducted and/or participated in the affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) in violation of 18 U.S.C. § 1962(c)) and/or

(ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)) and defrauded the Millers and other telemarketing customers in the process. Chancey committed these substantive RICO offenses by causing ALI (RICO Enterprise) and PWH (RICO Enterprise) to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself, Paradise, White, Schmidt, Todd, Klein and possibly others unknown at this time. Chancey knew that making and/or sending fraudulent solicitations, sales receipts, offers to buy or broker sales and/or purchase confirmations to the Millers and other telemarketing consumers/customers was fraudulent, misleading, and unlawful. Chancey knew such wrongful acts and practices would result in the conversion and theft of the Millers' coin inventory and the coins of other telemarketing consumers/customers that, in turn, would generate exorbitant compensation for himself. Chancey engaged in the scheme to take unfair advantage of the Millers and other consumers/customers. Chancey's wrongful acts proximately and/or directly caused substantial damages to the Millers and other telemarketing consumers/customers.

**RICO PERSON Sean Klein:**

**55.** Sean Klein (RICO Person) conducted and/or participated in concert with the business and financial affairs of the RICO Enterprises Austin Lloyd, Inc.  and P. White Holdings, LLC through a pattern of racketeering activity; to wit: Klein participated, directly and indirectly, with White, Schmidt, Paradise, Todd, Chancey and others, and together they acted with, by, and through various employees, representatives, and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 that generated multiple and repeated fraudulent and unlawful coin transactions with the Millers and numerous other of Defendants' telemarketing consumers/customers that, in turn, generated exorbitant compensation for Klein. In

association with White, Schmidt, Todd, Chancey and Paradise, Klein caused ALI (RICO Enterprise) and PWH (RICO Enterprise) to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts, and/or other purchase confirmations to the Millers and numerous other of Defendants' telemarketing consumers/customers.

56.     By his unlawful acts, Sean Klein (i) conducted and/or participated in the affairs of ALI (RICO Enterprise), and PWH (RICO Enterprise) in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and (c) (in violation of 18 U.S.C. §1962(d)), and defrauded the Millers and numerous other of Defendants' telemarketing consumers/customers in the process. Klein committed these substantive RICO offenses by causing ALI (RICO Enterprise) and PWH (RICO Enterprise) to engage in multiple predicate acts of mail fraud and wire fraud— all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself, White, Schmidt, Paradise, Todd, Chancey and possibly others unknown at this time. Klein knew that making and/or sending fraudulent solicitations, sales receipts, offers to buy or broker sales and/or purchase confirmations to the Millers and other telemarketing customers was fraudulent, misleading and unlawful. Klein knew such wrongful acts and practices would result in the conversion and theft of the Millers' coin inventory and the coins of other telemarketing consumers/customers that, in turn, would generate exorbitant compensation for himself. Klein engaged in the scheme to take unfair advantage of the Millers and numerous other of Defendants' telemarketing customers. Klein's wrongful acts proximately and/or directly caused substantial damages to the Millers and numerous other of Defendants' telemarketing consumers/customers.

57.     By engaging in the above-described actions and misrepresentations—which also was a consistent, regular, and dominant part of the manner in which the RICO Persons White, Paradise,

Schmidt, Todd, Chancey and Klein participated in and conducted the day-to-day business affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise)—White, Chancey, Todd, Paradise and Klein, under the control and direction of Schmidt and the other principals of ALI and PWH and with their knowledge and approval, instigated, perpetrated, and executed a scheme to defraud Miller and numerous other of ALI's telemarketing consumers/customers; to wit: the RICO Persons (White, Schmidt, Paradise, Todd, Chancey and Klein), individually or in concert, and by or through representatives and employees of the RICO Enterprises (ALI and PWH) engaged in repeated and systematic mail fraud and wire fraud (as described above) in violation of 18 U.S.C. §§ 1341; 1343 that generated multiple and repeated unlawful conversions and thefts of the coin inventory of the Millers and numerous other of ALI's telemarketing consumers/customers that, in turn, generated exorbitant compensation for them. White, Chancey, Todd, Paradise and Klein, under the control and direction of Schmidt and the other principals of ALI and PWH and with their knowledge and approval, caused the RICO Enterprises, to use the interstate mails and wires to repeatedly make and/or send fraudulent solicitations, sales receipts, offers to buy, broker, sell or auction coins and/or purchase confirmations to the Millers and other telemarketing consumers/customers through the above-described tactics. As such, White, Chancey, Todd, Paradise and Klein, under the control and direction of Schmidt and the other principals of ALI and PWH and with their knowledge and approval, conducted and/or participated in the business and financial affairs of the RICO Enterprises through a pattern of racketeering activity (i.e. repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343), as described above, that generated multiple and repeated unlawful conversions and thefts of the coin inventory of the Millers and numerous other of ALI's telemarketing consumers/customers that, in turn, generated exorbitant compensation for them. White, Chancey, Todd, Paradise and Klein, under the

control and direction of Schmidt and the other principals of ALI and PWH and with their knowledge and approval, committed these substantive RICO offenses, all the while knowing about, and agreeing to, the overall objective of the fraud—generating exorbitant compensation for themselves. By their unlawful actions, therefore, they (i) conducted and/or participated in the affairs of ALI and PWH (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired with others (the identities of whom are only known by them at this stage in the litigation) to violate 18 U.S.C. § 1962(b); (c) (in violation of 18 U.S.C. §1962(d), and defrauded the Millers and numerous other of Defendants' telemarketing consumers/customers in the process.

58.     White, Chancey, Todd, Paradise and Klein, under the control and direction of Schmidt and the other principals of ALI and PWH and with their knowledge and approval, caused the RICO Enterprises to engage in this fraudulent scheme with the intent, inter alia, to (i) shift the burden of proof to the Millers and other telemarketing consumers/customers knowing that they do not have unlimited resources and have limited knowledge and (ii) generate exorbitant compensation for themselves. The RICO Persons' wrongful actions and fraudulent scheme constitute mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343.

59.     The multiple, repeated, and continuous acts of mail fraud and/or wire fraud described in Paragraphs 18-20 and 32-42, above, plus the active fraudulent transactions, resulting in conversion and theft of consumers/customers' precious metal coins, including the Millers and other victims over the course of numerous years, constitute a pattern of unlawful activity under 18 U.S.C. § 1961(1); (5). Nothing about the RICO Persons' schemes to defraud the Millers and numerous other of Defendants' telemarketing consumers/customers indicated that the scheme has terminated or would ever terminate. Moreover, and independent of the duration of the scheme, their wrongful acts were and are a consistent, regular, and dominant part of the manner in which they participate

in and conduct the day-to-day business and financial affairs of the RICO Enterprises, ALI and PWH.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(as against RICO Persons WHITE, PARADISE,**
**SCHMIDT, TODD, CHANCEY and KLEIN)**

**60.** The preceding factual statements and allegations are incorporated by reference and re-alleged as if fully set forth at length.

**61.** ALI and PWH are each "enterprises" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

**62.** Christopher M. Paradise, Patrick J. White, David Schmidt, Mike Todd and Sean Klein are each "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

**63.** Christopher M. Paradise, Patrick J. White, David Schmidt, Mike Todd, and Sean Klein conducted and/or participated in the business and financial affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) through patterns of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, set forth above.

**64.** The patterns of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) (*see* ¶¶ 18-20 and 32-42, *supra*) by Christopher M. Paradise, Patrick J. White, David Schmidt, Mike Todd, and Sean Klein proximately and/or directly caused the Millers to suffer injury to his business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit, the Millers were damaged by, inter alia, the conversion and theft of their coin inventory and the corresponding mental anguish they have suffered. Christopher M. Paradise, Patrick J. White, David Schmidt, Mike Todd, and Sean Klein committed these substantive RICO offenses by using ALI and PWH to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to,

the overall objective of the mail fraud—generating exorbitant compensation for themselves. They knew their tactics and marketing practices were misleading and unlawful and would cause the Millers and numerous other of ALI's telemarketing customers to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(d) BY
### CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c)
### (as against RICO Persons WHITE, PARADISE,
### SCHMIDT, TODD, CHANCEY and KLEIN)

65.     The preceding factual statements and allegations are incorporated by reference and re-alleged as if fully set forth at length.

66.     ALI and PWH are each "enterprises" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d). Christopher M. Paradise, Patrick J. White, David Schmidt, Mike Todd, and Sean Klein are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

67.     Christopher M. Paradise, Patrick J. White, David Schmidt, Mike Todd, and Sean Klein conspired among themselves (and possibly with other persons, the identities of whom are only known by Defendants at this stage in the litigation) within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c); that is, they conspired to conduct and/or participate in the business and financial affairs of ALI (RICO Enterprise) and PWH (RICO Enterprise) through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(c); 1961(5); and 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, set forth above.

68.    The RICO Persons' pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d) were the causes-in-fact and proximate cause of the Millers' suffering injury to their business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit: the Millers were damaged by, inter alia, the conversion and theft of their coin inventory and the corresponding mental anguish they suffer. The RICO Persons themselves and through their representatives agreed to commit these substantive RICO offenses by using the RICO Enterprises (ALI and PWH) to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud—generating exorbitant compensation for themselves. They knew their tactics, schemes and marketing practices were misleading and unlawful and would cause the Millers and numerous other of Defendants' telemarketing consumers/customers to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their patterns of unlawful activity.

## COUNT IV
## FRAUDULENT INDUCEMENT

69.    The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

70.    White, Chancey, Todd, Paradise and Klein, under the control and direction of Schmidt and the other principals of ALI and PWH and with their knowledge and approval, utilized one or more of the above-described unlawful, false, misleading and unconscionable sales tactics to fraudulently induce the Millers to ship ALI their coin inventory for grading, appraisal, valuation and potential sale. Specifically, Defendants, by and through their employees and representatives, intentionally and fraudulently induced the Millers by: misrepresenting material facts which White, Chancey, Todd, Paradise and Klein, under the control and direction of Schmidt and the other principals of ALI and PWH and with their knowledge and approval, knew were false at the time they were made

33

with the intent to induce the Millers into shipping their coin inventory to ALI where it was converted and stolen to the benefit of the Defendants and at the expense of the Millers.

71.     Because the Millers justifiably relied upon material misrepresentations by White, Chancey, Todd, Paradise and Klein, under the control and direction of Schmidt and the other principals of ALI and PWH and with their knowledge and approval, and would never have entered into any agreements with ALI to ship their coin inventory to ALI for grading, appraisal and valuation and potential sale to ALI absent those misrepresentations, Defendants' wrongful actions constitute fraudulent inducement under New York law.

### COUNT V
### FRAUD AND/OR FRAUDULENT CONCEALMENT

72.     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

73.     White, Chancey, Todd, Paradise and Klein, under the control and direction of Schmidt and the other principals of ALI and PWH and with their knowledge and approval, convinced the Millers via a series of oral misrepresentations (as set out in detail above) to ship their coin inventory to ALI for grading, appraisal and valuation and potential sale and, having wrongfully obtained possession of the Millers' coin inventory and refused to return the coins but instead having absconded with them, thereby defrauded the Millers pursuant to New York common law.

74.     Specifically, White, Chancey, Todd, Paradise and Klein, under the control and direction of Schmidt and the other principals of ALI and PWH and with their knowledge and approval, utilized one or more of the above-described unlawful, false, misleading and unconscionable sales tactics to fraudulently induce the Millers to ship ALI their coin inventory for grading, appraisal, valuation and potential sale. Specifically, Defendants, by and through their employees and representatives, intentionally and fraudulently convinced the Millers to ship their entire coin inventory to ALI by

misrepresenting material facts which White, Chancey, Todd, Paradise and Klein, under the control and direction of Schmidt and the other principals of ALI and PWH and with their knowledge and approval, knew were false at the time they were made with the intent gain possession of the Millers' coin inventory where it was converted and stolen to the benefit of the Defendants and at the expense of the Millers.

75.     In addition, Defendants are liable for fraudulent concealment against Plaintiffs. The elements of fraudulent concealment are identical to the elements for fraud with the addition that the defendant must have a duty to disclose material information and failed to do so.

76.     Chancey and Todd, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White, Paradise, Schmidt and Klein, had a duty to disclose to Mr. Miller that they would not (and never did) conduct individual grading/coin valuations of numismatics but rather valuated numismatics just as they would have valuated mere bullion before he shipped the Millers' entire coin inventory to ALI. Chancey and Todd, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White, Paradise, Schmidt and Klein, had a duty to make such disclosure to Plaintiffs based upon the "special facts" doctrine, which provides that a duty to disclose arises when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair. The "special facts" doctrine is applicable to the present case because the withheld and hidden material information which was "peculiarly within the knowledge" of Chancey and Todd, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White, Paradise, Schmidt and Klein,  as representatives of ALI (and in fact made express material misrepresentations) as to ALI's protocol for appraising, grading, and valuating coins under consideration for purchase from consumers/customers. The information as to ALI's grading,

appraisal and valuation protocols and limitations was not such that could have been discovered by the Millers through the exercise of ordinary intelligence.

77.     Chancey and Todd, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White, Paradise, Schmidt and Klein, and with their knowledge and approval, made the above-detailed false representations to Mr. Miller with the intent that he rely upon them and with full knowledge that such representations were false when made. Mr. Miller relied on these material and false representations when deciding to ship the Millers' entire coin inventory to ALI for grading, appraisal, valuation and potential purchase by ALI to the Millers' financial detriment and Defendants' obscene financial gain. As a direct and/or proximate result of the false and misleading representations by Chancey and Todd, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White, Paradise, Schmidt and Klein, and with their knowledge and approval, the Millers suffered (and continue to suffer) damages arising from and  related to the conversion of the Millers' coin inventory which they sent to ALI for grading, appraisal, valuation, and potential purchase by ALI and mental anguish damages.

78.     By virtue of the confidential business relationship between Mr. Miller and Chancey, Todd, Klein, Paradise and White, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White, Paradise, Schmidt and Klein, Defendants had a duty to disclose the above-described concealed material facts to the Millers. Their deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the above-described concealed material facts, are the equivalent of false representations and/or omissions. Such false representations and/or omissions were made knowingly and intentionally by Chancey, Todd, White, Klein and Paradise, and possibly other ALI telemarketing salespersons and representatives, under the control

and direction of White, Paradise, Schmidt and Klein, and with their knowledge and approval, or, at the very least, in reckless disregard of Plaintiff's rights and interests.

79.    Plaintiff justifiably relied on the false representations and/or omissions of Chancey, Todd, White, Klein and Paradise, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White, Paradise, Schmidt and Klein, and with their knowledge and approval, to the Millers' financial detriment. Defendants' wrongful actions constitute fraud at common law.

80.    Chancey, Todd, White, Klein and Paradise, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White, Paradise, Schmidt and Klein, and with their knowledge and approval, concealed their wrongful actions with the intent to mislead and defraud the Millers. The Millers were not aware of, nor, through the exercise of due diligence, could they have become aware of Defendants' wrongful actions until after Mr. Miller had shipped the coin inventory to ALI and such wrongful actions were brought to light by third parties. Due to the Parties' confidential business relationships, which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, Chancey, Todd, White, Klein and Paradise, and possibly other ALI telemarketing salespersons and representatives, under the control and direction of White, Paradise, Schmidt and Klein, and with their knowledge and approval, had a duty to disclose to Plaintiffs the above materially false information. Defendants' failure to do so constitutes fraudulent concealment under New York law.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

81.    The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

82.     Defendants made certain representations to Mr. Miller in the course of their business and in transactions in which Defendants had a substantial monetary interest. Defendants negligently supplied false information that guided Mr. Miller in his decision to ship the Millers' coin inventory to ALI for grading, appraisal, valuation, and potential sale to ALI.

83.     Defendants failed to exercise reasonable care and competence in obtaining, confirming the accuracy of, and communicating such information to Mr. Miller by, inter alia, utilizing one or more of the above-described unlawful, false, misleading and unconscionable sales tactics typical of the precious metals/coins/bullion/numismatic direct sales industry and/or making the above-described false and material misrepresentations and omissions.

84.     Mr. Miller justifiably relied on Defendants' negligent misrepresentations when he shipped the Millers' coin inventory to ALI for grading, appraisal, valuation, and potential sale to ALI, which misrepresentations directly and/or proximately caused him to suffer damages to the financial benefit of Defendants. Mr. Miller continued to justifiably rely upon Defendants' negligent misrepresentations in their oral telephonic representations regarding the grossly under-valuated coins and representations that ALI would return the coins to the Millers, which directly and/or proximately caused the Millers to suffer ruinous damages to the financial benefit of Defendants. Defendants' wrongful conduct constitutes negligent misrepresentation under New York common law.

## COUNT VIII
## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349

85.     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

**86.**   Defendants' actions described herein constitute deceptive acts and practices in the conduct of business, substantially affecting trade or commerce in New York in violation of the New York Consumer Protection from Deceptive Acts and Practices, Gen. Bus. Law § 349.

**87.**   More specifically, Defendants and their telemarketer employees and representatives knowingly and intentionally utilized unlawful, false, misleading, deceptive and unconscionable high-pressure sales tactics to convince the Millers to ship their entire coin inventory to ALI for grading, appraisal, valuation, and potential sale to ALI by, one or more of the following deceptive acts or practices, including:

a.   Misrepresenting attributes of precious metal coins to move customers from bullion to the over-priced numismatic and semi-numismatic coins;

b.   Claiming that the coins could be held for a short period and then go to auction where they would bring "huge gains";

c.   Enticing the customer to buy coins to be sold in a special auction wherein the customers would realize large profits and then subsequently claiming the auction was cancelled;

d.   Misleading customers to send coins back for sale or auction with assurances that the customers would realize large profits, while Defendants possessed actual knowledge that sale or auction would take place, and Defendants would simply convert the customers' coins for Defendants' own profit;

e.   Stalling customers with fraudulent alleged business interruptions such as auctions cancelling, third-party buyers backing out of sales due to alleged estate issues, accounting issues, banking issues, shipping issues, etc.;

f.   Confusing the customer by misstating previous representations on trades, returns, values, coins, and various other tactics in an effort to obfuscate the transactions and frustrate the tracking of the transactions;

g.   Advising customers to purchase "unique" bullion coins, when, in fact, there is nothing unique about the coins;

h. Trading or holding-for-trade coins with the promise to sell at a profit, when such inducement was merely intended to stall the customer, obfuscate the transactions, and delay the return of the coins or the purchase price or simple conversion of the coins;

i. Using grading and marketing to deceptively sell bullion at a premium as some type of "modern numismatics," even though there are very large populations of the high-grade coins and/or the "certification" is commonly duplicated with minor expense;

j. Misrepresenting the market value of "certified coins" to prevent or delay customers from determining the actual market price of bullion coins;

k. Claiming a volatile market based upon the spot price of gold yet selling bullion coins at such exorbitant and fraudulent prices to make "market price" nothing but a gimmick; and

l. Various other acts and practices that may be uncovered during discovery.

88. As a direct and proximate result of Defendants' unlawful, unfair, and deceptive acts and practices, the Millers have suffered actual damages of over Ninety-Two Thousand Dollars ($92,000.00).

## COUNT IX
## NEGLIGENCE

89. The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

90. Defendants negligently graded, appraised and valuated the Millers' coin inventory and then, adding insult to injury, refused, and continue to refuse, to return the coin inventory to the Millers. This violated and breached Defendants' duty to Plaintiffs to exercise reasonable care. Defendants' wrongful conduct directly and/or proximately caused the Millers to suffer damages. Defendants' wrongful conduct constitutes negligence at common law.

## COUNT X
## MONEY HAD AND RECEIVED

91.     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

92.     By their above-described wrongful actions and/or inaction, (1) Defendants received money belonging to Plaintiffs, (2) Defendants benefitted from receipt of the money, and (3) under principles of equity and good conscience, Defendants should not be permitted to keep the money. Defendants, therefore, should be compelled to refund such wrongfully charged and collected funds to Plaintiffs under the equitable doctrine of money had and received.

## COUNT XI
## CONVERSION

93.     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

94.     Plaintiffs have and maintain a possessory right and interest over their coin inventory and all increase and profits earned on any sales of said coins shipped to Defendants for grading, appraisal and valuation and potential sale.

95.     Plaintiffs requested the return of their coins and/or the proceeds from any sale of such coins.

96.     Defendants had an obligation to forward Plaintiffs the proceeds from sale of their coins or else to return the coins to them.

97.     Defendants wrongfully continue to exercise control over Plaintiffs' coins or the proceeds from the sale of those coins.

98.     Defendants' wrongful control over Plaintiffs' coins or the proceeds of their sale and refusal to return such coins or the proceeds of sale is an interference of Plaintiffs' ownership rights.

**99.**     As a result of Defendants' wrongful control over their funds, Plaintiffs have been damaged in the amount of at least the $92,000.00 value of the wrongfully retained coins, as well as consequential damages and interest.

**100.**     By virtue of the foregoing, Defendants have committed the tort of conversion, and Plaintiffs are entitled to damages in an amount to be determined at trial, but in no event less than $92,000.00 plus interest.

**COUNT XII**
**UNJUST ENRICHMENT**

**101.**     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

**102.**     Defendants (and possibly other persons and entities, including Defendants' employees and representatives) have been unjustly enriched by (i) being paid for coins that were not legally theirs to keep or to sell; (ii) using the fraudulently obtained revenues and profits from the Miller's coin inventory, and (iii) generating a return on the amounts described in (i) and (ii).  Accordingly, the Millers seek to impose a constructive trust over (and recover) all amounts by which Defendants (and possibly other persons and entities, including Defendants' employees and representatives) have been unjustly enriched.

**COUNT XIII**
**ALTER-EGO**

**103.**     Alter-ego liability is established upon a showing that a defendant has complete domination of a corporation in respect to the transaction at issue and that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. Because a decision to pierce the corporate veil will necessarily depend on the attendant facts and equities of the case at issue, there are no definitive rules governing the circumstances when this power may be exercised.

**104.**     Based upon information and belief, Christopher M. Paradise, Patrick J. White, David Schmidt, Mike Todd, and Sean Klein (and possibly Brandon Chancey), individually and collectively, use the corporate form as an alter-ego and as mere tools or business conduits. They completely dominate ALI and PWH to shield assets and thus cause a diminution of available resources from which the Millers may obtain satisfaction of the damages directly and/or proximately caused by Defendants' wrongful conduct. Upon information and belief, there are undocumented funds transfers between ALI and PWH and the Defendants, and there is an unclear allocation of profit and losses between ALI and the Defendants and/or PWH and the Defendants. In short, ALI and PWH are substantially one and the same with Christopher M. Paradise, Patrick J. White, David Schmidt, Mike Todd, and Sean Klein, or some of them, and the relationship between them is an illegitimate use of the corporate form.

**XIV**
**RESPONDEAT SUPERIOR**

**105.**     The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length.

**106.**     Defendants also are liable for the above wrongful acts committed by their employees during the course and scope of their employment by the Defendants; to wit, the employees' and representatives' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the employees/representatives were hired (i.e., converting and profiting from coins shipped to ALI for grading, appraisal and valuation by customers like Plaintiffs)—all of which directly and/or proximately caused Plaintiffs to suffer damages to the financial benefit of Defendants—and for which Defendants are liable under the doctrine of *respondeat superior*.

**RELIEF REQUESTED**

107.   **RECISSION**.  Based on Defendants' above-described wrongful conduct, Plaintiffs are entitled to recission of the transaction(s) at issue by which Defendants converted Plaintiffs' coin inventory. All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

108.   **ACTUAL AND CONSEQUENTIAL DAMAGES.**  As direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered (and continue to suffer) damages in the form of, *inter alia*, the conversion of Plaintiffs' coins by Defendants. Plaintiffs are entitled to recover consequential damages related to the converted coin inventory when Mr. Miller was lured into shipping the coin inventory to ALI and the mental anguish Millers have suffered in connection with that transaction—in an amount to be determined by the trier of fact.  All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

109.   **AUTOMATIC TREBLE DAMAGES UNDER 18 U.S.C. § 1964(c).**  Plaintiffs also are entitled to treble damages for Defendants' knowing, willful and intentional wrongful conduct in violation of the RICO statute under 18 U.S.C. § 1964(c).  All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

110.   **EXEMPLARY DAMAGES**.  Defendants' wrongful actions (and failure to disclose such wrongful actions) were committed intentionally, willfully, with malice and/or with conscious and/or reckless disregard for Plaintiffs' rights and interests.   Accordingly, Plaintiffs also are entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future.

**111.    ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS**.  Plaintiffs also are entitled to recover their reasonable and necessary attorneys' fees, litigation expenses and court costs to be determined by the trier of fact.

WHEREFORE, Plaintiffs request judgment in their favor and against the Defendants, jointly and severally, awarding compensatory damages for all actual and consequential losses, treble damages under 18 U.S.C. § 1964(c), exemplary damages, and all amounts by which Defendants have been unjustly enriched; directing an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by Defendants, including the imposition of  a constructive trust and the voiding of unlawful transfers; and awarding attorneys' fees and litigation expenses pursuant to 18 U.S.C. § 1964(c) and New York G.B.L. § 349(h) and the costs of suit pursuant to 28 U.S.C. § 1920 and Fed. R. Civ. P. 54(d); together with pre-judgment interest pursuant to New York C.P.L.R. § 5004 or any higher applicable rate and post-judgment interest at the highest legal rate, and such other and further relief as the Court deems just, proper, and equitable.

Dated: New York, New York
        August 17, 2023

LAW OFFICES OF KENNETH G. WALSH

By:___*/s/Kenneth G. Walsh*_____
        Kenneth G. Walsh (1654)
        59 Kensico Road, Suite 7
        Thornwood, New York 10594
        (929) 241-7307
        kwalsh@kgwalshlegal.com

**STEVENS LAW FIRM**

By: /s/ R. Lyn Stevens
R. Lyn Stevens (pro hace vice forthcoming)
20540 Hwy 46 West
Suite 115-420
Spring Branch, Texas 78070
(409) 880-9714
*Lyn@Stevens.Law*

***ATTORNEYS FOR PLAINTIFFS,***
***ALLAN R. MILLER AND***
***CHERYL A. MILLER***